IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | |
|---|---|
| Caitlin V. Neal,<br><br>                Plaintiff,<br><br>v.<br><br>Operators of the Digital Properties Set Forth in Exhibit 1,<br><br>                Defendants. | Case No: 2:24-cv-00263-GSL-AZ<br><br>Dist. Judge Gretchen S. Lund<br><br>Mag. Judge Abizer Zanzi |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER, INCLUDING A TEMPORARY ASSET RESTRAINT, AND EXPEDITED DISCOVERY**

Plaintiff Caitlin V. Neal ("Plaintiff" or "Neal"), by and through Plaintiff's undersigned counsel, submits this Memorandum of Law in Support of Plaintiff's *Ex Parte* Motion for Entry of a Temporary Restraining Order, Including a Temporary Asset Restraint, and Expedited Discovery ("*Ex Parte* Motion"). In compliance with Federal Rule of Civil Procedure 65(b)(1), Plaintiff attaches the Declaration of Caitlin V. Neal ("Neal Decl.") and Declaration of Ilya G. Zlatkin ("Zlatkin Decl.") to this Memorandum.

**I.   INTRODUCTION**

Plaintiff is requesting temporary *ex parte* relief based on actions constituting false endorsement and misappropriation of aspects of Plaintiff's Personality (as defined below) under Indiana's right of publicity statute. As detailed and elaborated in the First Amended Complaint ("FAC"), exhibits to the FAC, Plaintiff's declaration, and in this brief, Defendants, who operate the digital properties set forth in Exhibit 1 of the FAC [Dkt. 10] (collectively, "Defendants"), are selling adult-oriented products of dubious quality ("Defendants' Products") through at least the fully interactive, ecommerce websites identified within Exhibit 1 attached to the FAC (collectively, "Point-of-Sale Sites"). Despite most likely being based abroad, Defendants explicitly

target sales to U.S. residents, including Indiana residents, by setting up and operating ecommerce stores at the Point-of-Sale Sites, through which Indiana residents can purchase Defendants' Products. Defendants seek to entice consumers by running campaigns of online ads on social media. Some of these online ads include aspects of Plaintiff's Personality without Plaintiff's consent.

Plaintiff had to file this action to combat Defendants' misappropriation of Plaintiff's Personality and the irreparable injury Defendants' infringements continue to inflict on Plaintiff's brand. Plaintiff also seeks to safeguard consumers from the purchase of products over the internet based on the mistaken belief that the products are endorsed by the Plaintiff. Defendants' unlawful activities should be restrained. Plaintiff respectfully requests that this Court issue *ex parte* a Temporary Restraining Order, Temporary Asset Restraint, and Expedited Discovery.

## II. <u>BACKGROUND</u>

### Plaintiff's Business

Plaintiff is a renowned sexologist and sexual health and relationship coach. (FAC ¶ 10.) In addition to providing sex-coaching services through her company BPP Coaching, Inc., Plaintiff has established several digital properties through third-party social media platforms. (*Id*. ¶¶ 12–13.) Plaintiff's social media accounts have garnered a significant following. (*Id*. ¶¶ 14–15.) In fact, in 2022, Plaintiff starred as the host of the reality television show *Good Sex*, which was exhibited on (and remains accessible through) the streaming platform Discovery Plus. (*Id*. ¶ 16.) Plaintiff was also featured in the cover story of the Fall 2024 issue of *Sexual Health* magazine. (*Id*.) Plaintiff has become a trusted source of information about sexual topics, including a variety of adult-oriented products. (*Id*. ¶ 17.) She has leveraged her following into opportunities to serve as an

ambassador for various brands in the sexual health space, including with respect to adult-oriented goods and services. (*Id*. ¶ 18.)

Plaintiff earns her livelihood within the sexual health space, including through the commercial use of her name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, and mannerisms (collectively, "Personality"), which she often licenses to third parties. (*Id*. ¶ 19.) Plaintiff has invested substantial resources, time, money, and commercial effort in order to establish the goodwill associated with her Personality. Plaintiff's Personality is indispensable to Plaintiff's business operations, and Plaintiff maintains all lawful rights, title, and interest in her Personality to enforce and protect her rights therein.

**Defendants' Unlawful Activities**

Defendants are ecommerce merchant(s) most likely based in China. (FAC ¶ 3; *see also* Dkt. 10–11.) Defendants have been offering for sale and selling Defendants' Products. (FAC ¶¶ 20–21; Dkt. 10.) Plaintiff has discovered that, in July, August, September, and October 2024, Defendants initiated online marketing campaigns for Defendants' Products that used aspects of Plaintiff's Personality in at least seventeen ads on social media (collectively, "Infringing Ads"). (FAC ¶ 22; Dkt. 12.) Specifically, the seventeen Infringing Ads feature Plaintiff's image, photograph, likeness, and distinctive appearance adjacent to the phrase "Try This!" and an "Order Now" link. (FAC ¶ 22; Dkt. 12.) Pressing the "Order Now" button redirects internet users to one of several Point-of-Sale Sites, through which consumers, including Indiana residents, can purchase (and have purchased) Defendants' Products. (FAC ¶¶ 23–24; Zlatkin Decl. ¶ 2; Neal Decl. ¶ 15; *see also* Dkt. 10, Dkt. 12.) At a minimum in the Infringing Ads, Defendants have used Plaintiff's Personality without Plaintiff's consent for the commercial purpose of promoting the sale of Defendants' Products. (FAC ¶¶ 26, 39–40.) Plaintiff believes that she has been harmed by the

unauthorized use of her Personality, and she further believes that there is a likelihood that her followers will be confused about whether Plaintiff is in any way associated with Defendants or Defendants' Products. (*See* FAC ¶¶ 25, 31.)

### III. ARGUMENT

Defendants' purposeful, intentional, and unlawful conduct is causing and will continue to cause irreparable harm to Plaintiff's brand and business enterprise. Federal Rule of Civil Procedure 65(b) provides that this Court may issue an *ex parte* TRO where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition. FED R. CIV. P. 65(b). A TRO is appropriate in this matter because a TRO will help immediately stop Defendants' unauthorized uses of Plaintiff's Personality and will help preserve the status quo until a hearing may be held. *See American Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974)).

The TRO must be granted without notice in order to prevent further irreparable harm to Plaintiff. In the absence of a TRO without notice, Defendants can – and will – register new ecommerce stores, websites, and social media accounts under new aliases, move all of the assets to offshore bank accounts outside the jurisdiction of this Court, and thereby frustrate and deprive Plaintiff of any opportunity to seek equitable relief. (Neal Decl. at ¶¶ 16–22). District courts within the Seventh Circuit have recognized that civil actions against infringers present special challenges that warrant proceeding on an *ex parte* basis. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Jasso*, 927 F. Supp. 1075, 1077 (N.D. Ill. 1996) (observing that "proceedings against those who deliberately traffic in infringing merchandise are often useless if notice is given to the infringers"); *Chrome Cherry Ltd. v. P'ships, et al.*, No. 21-CV-05491, 2021 WL 6752296, at *2 (N.D. Ill.

Oct. 20, 2021) ("[S]hould Defendants be informed of this proceeding before a temporary restraining order could issue, Defendants will likely register new e-commerce stores under new aliases and move assets to offshore bank accounts outside the jurisdiction of this Court."). As such, Plaintiff requests that this Court issue the requested *ex parte* TRO.

This Court maintains original subject matter jurisdiction given the claims in this proceeding arise out of the Lanham Act. 28 U.S.C. §§ 1338(a); 28 U.S.C. § 1331; 15 U.S.C. § 1121(a). This Court additionally maintains supplemental jurisdiction over Plaintiff's related state law claim as it arises out of the same case or controversy as Plaintiff's federal claim. 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391.

This Court may properly exercise personal jurisdiction over Defendants since Defendants directly target business activities toward consumers in the United States, including Indiana, through at least the fully interactive, ecommerce stores operating at the Point-of-Sale Sites. Specifically, Defendants have targeted sales to Indiana residents by having the Infringing Ads be viewable in Indiana, setting up and operating at least three ecommerce stores that target United States consumers using several websites (at a minimum including the Point-of-Sale Sites), offer shipping to the United States, including Indiana, accept payment in U.S. Dollars, and have sold Defendants' Products to residents of Indiana. *See NBA Props., Inc. v. HANWJH,* 46 F.4th 614, 627 (7th Cir. 2022) (holding that a single sale to an agent of the plaintiff can create personal jurisdiction), *cert. denied*, 143 S.Ct. 577 (2023); *see also Delta Faucet Co. v. Watkins*, 1:23-cv-00200-JMS-CSW, 2023 WL 8527092, at *4 (S.D. Ind. Dec. 8, 2023) ("Courts across the Seventh Circuit have repeatedly held that the Due Process Clause allows the exercise of jurisdiction over an out-of-state defendant who sells allegedly infringing products to forum residents through a website or online storefront.") (collecting cases). In this case, in addition to using Neal's

Personality to market Defendants' Products to Indiana residents, Defendants have actually sold the Defendants' Products to purchasers in Indiana, including specifically into this District, after such purchasers were redirected to the Point-of-Sale Sites from the Infringing Ads. (FAC at ¶¶ 9, 24, 37; Neal Decl. ¶ 15; Zlatkin Decl. ¶ 2.). Such transportation of Defendants' Products into Indiana through the violation of Neal's right of publicity subjects Defendants to the jurisdiction of Indiana courts. *See* IND. CODE § 32-36-1-9(3).

Furthermore, defendants are explicitly subject to the jurisdiction of Indiana courts if they knowingly cause advertising or promotional material "to be published, distributed, exhibited, or disseminated within Indiana" in violation of Indiana's right of publicity statute. IND. CODE § 32-36-1-9(4). Defendants are committing tortious acts in Indiana, are engaging in interstate commerce, and have wrongfully caused Plaintiff substantial injury in the State of Indiana. Defendants also have knowingly caused the publication, distribution, exhibition, and dissemination of the Infringing Ads within Indiana and have actually shipped Defendants' Products into Indiana. (FAC at ¶¶ 9, 24, 37; Neal Decl. ¶ 15, Zlatkin Decl. ¶ 2.)This Court has personal jurisdiction over Defendants.

### a. Legal Standard for Temporary Restraining Order and Preliminary Injunction.

Courts within this Circuit hold that the standard for granting a TRO and the standard for granting a preliminary injunction are identical. *See*, *e.g.*, *Bartole v. Tippecanoe Cnty.*, No. 2:23CV7-PPS/JPK, 2023 WL 2328206, at *3 (N.D. Ind. Mar. 2, 2023) (citing *Cassell v. Snyders*, 458 F. Supp. 3d 981, 990 (N.D. Ill. 2020)), *appeal dismissed*, No. 23-1676, 2023 WL 10949057 (7th Cir. Oct. 20, 2023). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### i. **Plaintiff is Likely to Succeed on the Merits.**

To satisfy the first prong, a "mere possibility of success is not enough," but the party seeking injunctive relief does not need to "show that it definitely will win the case." *Ill. Republican Party*, 973 F.3d at 762–63. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. at 763. The Court "must make an assessment of the merits as 'they are likely to be decided after more complete discovery and litigation.'" *Hill v. Warden*, 3:24-CV-22-PPS-APR, 2024 WL 939210, at *1 (N.D. Ind. Mar. 5, 2024) (quoting *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022)). In this case, Plaintiff can meet her burden with respect to both the Lanham Act and state law claims.

#### 1. *False Endorsement Under the Lanham Act*

The Lanham Act imposes liability on any person who, "on or in connection with any goods or services," falsely or in a misleading manner describes or represents a fact that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," if the latter person "believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1); *see also 3M Co. v. Cont'l Diamond Tool Corp.*, No. 1:21-CV-274-HAB, 2022 WL 2355481, at *4 (N.D. Ind. June 30, 2022) ("False endorsement occurs when an individual's identity is connected with a product or service in such a way that consumers are likely to be misled about the individual's sponsorship or approval of the product or service.").

In this case, Defendants have used multiple aspects of Plaintiff's Personality in online advertisements for each of the Defendants' Products without Plaintiff's consent. (FAC ¶ 26; Neal Decl. ¶¶ 10–14). In doing so, Defendants have, at a minimum, misrepresented an affiliation, connection, or association of Defendants with Plaintiff. (*See* Dkt. 12.) Such actions also misrepresent Plaintiff's purported approval of Defendants' Products and of the Defendants' commercial activities. (*See id*.) Each of the Infringing Ads features an image of Plaintiff reacting with purported enthusiasm for the product (in most instances pointing a finger at an image of the product), with the words "Try This!" next to Plaintiff's Personality. (Neal Decl ¶ 14; *see also* Dkt. 12.) The Infringing Ads also make dubious statements about the supposed effects of using Defendants' Products. (Neal Decl ¶ 11.) Plaintiff is being harmed through such actions – both economically and reputationally – and she believes that she will continue to be harmed as a result of Defendants' continued use of her Personality in association with the Defendants' Products. (Neal Decl. ¶¶ 24–28.)

For false endorsement claims in particular, a plaintiff "must show that the terms defendants used and the representations they made [in advertisements] likely caused consumers to believe that the plaintiff endorsed defendants' products." *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 935 (N.D. Ill. 2016); *see also Woodard v. Victory Records, Inc.*, No. 11-C-7594, 2016 WL 1270423, at *9 (N.D. Ill. Mar. 31, 2016) (LEE, J.) (citing *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 522 (7th Cir. 2014)). The primary focus is on consumer confusion. *Martin*, 183 F. Supp. 3d at 935. "Consideration of consumer confusion in the false-endorsement context involves several factors, 'including the level of plaintiff's recognition among the segment of the society for whom defendant's product is intended, the relatedness of plaintiff's fame or success to defendant's product, and defendant's intent in selecting the plaintiff.'" *Walkowicz v. Am. Girl*

*Brands, LLC*, No. 20-cv-374-jdp, 2021 WL 510729, at *4 (W.D. Wis. Feb. 11, 2021) (quoting *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 883 (E.D. Wis. 2009), *aff'd* 623 F.3d 436 (7th Cir. 2010)).

With respect to the first consumer-confusion factor, an individual does not need to be a celebrity, but rather simply needs to have achieved "notoriety among a subset of the population." *3M Co.*, 2022 WL 2355481, at *4. While Plaintiff is arguably already a celebrity, Plaintiff has certainly achieved the requisite level of recognition, as her YouTube channel alone has hundreds of thousands of subscribers, and her videos have been viewed over 140 million times in the aggregate. (Neal Decl. ¶ 5.) As of the date of this *Ex Parte* Motion, over thirty of the videos on Plaintiff's YouTube channel have garnered at least 1 million views, with the most-viewed video having been viewed over 6 million times. (*Id*.) That is plenty sufficient to support that Plaintiff would be recognizable within the Defendants' target market. *See, e.g.*, *Walkowicz*, 2021 WL 510729, at *4 (finding it reasonable to infer that "at least some part" of an intended market was captured when some of a celebrity scientist's presentations had been viewed more than one million times). In addition, Plaintiff's participation as a host of a sex-themed reality TV show on a major platform further broadens Plaintiff's recognition, as does a cover story about Plaintiff in *Sexual Health* magazine. (Neal Decl ¶¶ 6–7.) Plaintiff also easily satisfies the second factor, as she is known specifically within the sexual health and wellness space, which is exactly the industry of the Defendants' Products. (*Id*. ¶¶ 8–10.) Finally, with respect to the third factor, it is reasonable to infer that Defendants elected to misappropriate specifically Plaintiff's Personality to lend legitimacy to Defendants' Products. *See Walkowicz*, 2021 WL 510729, at *4.

Anecdotal evidence also supports the existence of consumer confusion. *See id*. Plaintiff has received multiple inquiries from followers who have genuinely wondered whether Plaintiff

actually endorsed Defendants' Products. (Neal Decl. ¶ 10.) Plaintiff also believes that at least some of her followers have purchased Defendants' Products under the mistaken belief that Plaintiff endorses Defendants' Products. (*See id*.) Such circumstances evidence a textbook example of false endorsement, leading to the conclusion that Plaintiff is likely to succeed on the merits of her Lanham Act claim.

### 2. *Misappropriation of Right of Publicity*

Under Indiana's right of publicity statute, it is prohibited, without prior written consent, to use any aspect of an individual's Personality for commercial purposes, as long as such Personality has commercial value. IND. CODE § 32-36-1-8(a); *see also* IND. CODE § 32-36-1-6 (defining "personality"); IND. CODE § 32-36-1-7 (defining "right of publicity"); IND. CODE § 32-36-1-17 (providing a limited list of people who may provide written consent). An individual's Personality ipso facto has "commercial value" if a defendant elects to use it in an advertisement. *Fry v. Ancestry.com Operations*, No. 3:22-CV-140-JD, 2023 WL 2631387, at *7 (N.D. Ind. Mar. 24, 2023) ("[T]he Court finds it fairly obvious that [plaintiff's] name and likeness have commercial value. Why else would [defendant] bother to include it in its advertisements?"). Recognition of aspects of an individual's Personality within a particular targeted community is sufficient for commercial value to exist. *See id*. At the same time, defendants are deemed to use a Personality for a "commercial purpose" if the use is "[o]n or in connection with a product, merchandise, goods, services, or commercial activities" or "[f]or advertising or soliciting purchases of products, merchandise, goods, services, or for promoting commercial activities." *Id*. (quoting IND. CODE § 32-36-1-2).

The Indiana right of publicity statute expressly applies regardless of where a plaintiff is domiciled as long as a prohibited "act or event" occurs in Indiana. *Donovan v. Bishop*, No. 1:09-

CV-275-WTL-TAB, 2010 WL 4062370, at *5 (S.D. Ind. Oct. 14, 2010) (quoting IND. CODE § 32-36-1-1(a)). The circumstances that may serve as the basis of personal jurisdiction in Indiana have been deemed as examples of Indiana-based acts or events for purposes of the statute's applicability. *See Boshears v. PeopleConnect, Inc.*, No. C21-1222 MJP, 2022 WL 888300, at *3 (W.D. Wash. Mar. 25, 2022) (citing IND. CODE § 32-36-1-9), *vacated in part on other grounds, appeal dismissed in part*, No. 22-35262, 2023 WL 4946630 (9th Cir. Aug. 3, 2023), *and vacated in part on other grounds, appeal dismissed in part*, 76 F.4th 858 (9th Cir. 2023). Notably, factually supported allegations that an individual's photographs were used in advertisements viewable online by users in Indiana are sufficient for satisfying the statute's territoriality requirement. *See Fry*, 2023 WL 2631387, at *8; *Boshears*, 2022 WL 888300, at *3. The sale of products into Indiana in conjunction with the personality in question similarly qualifies as an "offensive act" under the statute. *Donovan*, 2010 WL 4062370, at *5.

Here, Defendants have used, at a minimum, Neal's image, photograph, likeness, and distinctive appearance – all aspects of her Personality. (Neal Decl. ¶¶ 10–14; Dkt. 12.) Neal has also sufficiently shown that her Personality has commercial value, given her extensive following on social media, as well as participation in a widely distributed reality TV program showcasing her sex-coaching operations. (Neal Decl. ¶¶ 4–9*; see also* Dkt. 9-4, Dkt. 9-5, Dkt. 9-6.) Defendants' Infringing Ads were distributed on social media, seeking to leverage Neal's credibility in the sexual health space to promote their adult-oriented wellness products. (Neal Decl. ¶¶ 10–14; Dkt. 12.) In fact, Neal discovered the infringing uses of her Personality as a result of some of her followers reaching out to her to determine whether she had actually endorsed such products. (Neal Decl. ¶ 10.) The Infringing Ads were viewable in Indiana, and Defendants' Products were purchased into Indiana from Point-of-Sale Sites that were visited by following the "Order Now"

links from the Infringing Ads. (Zlatkin Decl. ¶ 2; Neal Decl. ¶ 15.) Defendants did not obtain any written consent from Neal or anyone else who may have any authority to grant such consent. (Neal Decl. ¶ 11.) For largely the same reasons as Neal's false endorsement claim, she has demonstrated a high likelihood of success on the merits of her state law right of publicity claim.

ii. **Plaintiff Will Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Plaintiff is likely to suffer irreparable harm due to Defendants' blatant and unlawful acts of false endorsement and violation of Plaintiff's right of publicity. "In the context of trademark law, once the movant establishes a likelihood of success on the merits, it is statutorily entitled to a rebuttable presumption of irreparable harm." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023) (citing 15 U.S.C. § 1116(a)), *cert. denied*, 144 S. Ct. 2630 (2024). False endorsement claims are, effectively, a subset of trademark law. *3M Co.*, 2022 WL 2355481, at *4 ("In the context of false endorsement claims . . . the 'mark' at issue is the [individual's] identity.").

Furthermore, this Court has previously noted that the general presumption of irreparable harm in trademark law "stems from the difficulty of quantifying the likely negative effect on a brand from consumer confusion" resulting from the infringement. *Tempur Sealy Int'l v. Luxury Mattress & Furniture LLC*, 2:23-CV-383-GSL-APR, 2024 WL 2288890, at *2 (N.D. Ind. May 20, 2024) (LUND, J.) (citing *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013)). Though this case does not concern trademark infringement, Defendants' unauthorized insinuations as to Plaintiff's endorsement and misappropriations of Plaintiff's right of publicity certainly still cause a detrimental impact on Plaintiff's brand. *See SKS Merch, LLC v. Barry*, 233 F. Supp. 2d 841, 847 (E.D. Ky. 2002) ("irreparable harm may be presumed from a finding of a likelihood of confusion as to the Plaintiffs' sponsorship and approval of and association with the merchandise sold by the Defendants.");

*Nasser v. The S. Bend Clinic, LLC*, 3:23-CV-506 DRL-MGG, 2024 WL 940065, at *16 (N.D. Ind. Mar. 5, 2024) ("The right to publicity concerns . . . the unauthorized commercial use of someone's name, more akin to a reputation harm."). The bottom line is that "loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021).

      Even without this presumption, however, Plaintiff has still sufficiently shown the existence of irreparable harm, including through a likelihood of consumer confusion. Plaintiff filed Plaintiff's original complaint in this case on July 31, 2024. (Dkt. 1.) The original complaint addressed only a single marketing campaign that had begun barely a week prior to the filing of the original complaint. (*See* Dkt. 5.) After filing the original complaint, it was brought to Plaintiff's attention that another online marketing campaign had been started for different products by a supposedly different storefront following the same methodology. (Neal Decl ¶ 12.) A purchase of the second product revealed that the same defendant was behind the second electronic storefront. (Neal Decl.¶ 16; *see also* Dkt. 10.) Subsequently, in late August and early September 2024, similar campaigns were started for yet a third product, and October 2024 yielded campaigns for a fourth and fifth product. (Neal Decl. ¶¶ 12–13; *see also* Dkt. 12.) As investigations into the Defendants' operation and as purchases of the Defendants' Products have revealed, Defendants are interrelated. (Neal Decl. ¶ 16; *see also* Dkt. 10 (showing overlap in domains and email addresses).) Defendants' actions threaten the Plaintiff's established goodwill with followers (including some who purchase adult-oriented wellness products). (Neal Decl. ¶¶ 24–27.) In turn, such negative impressions are also likely to impact Plaintiff's relationships with sponsors and legitimate businesses with whom Plaintiff actually collaborates in relation to adult-oriented wellness products. (Neal Decl. ¶ 27.)

Furthermore, because Defendants are businesses which, upon information and belief, are domiciled in the People's Republic of China, (*see* Dkt. 11), or other foreign jurisdictions with no meaningful U.S. presence, any monetary judgment is highly likely to be uncollectible. *See, e.g.*, *Aevoe Corp. v. AE Tech Co.*, Ltd., No. 2:12-cv-0053, 2012 WL 760692, at *5 (D. Nev. Mar. 7, 2012) ("[A] finding of irreparable harm was not clearly erroneous because it also found that since [defendant] is a foreign corporation, money damages would be insufficient."); *Otter Prods. v. Anke Group Indus. Ltd.*, 2:13-cv-00029-MMD, 2013 WL 5910882, at *2 (D. Nev. Jan. 8, 2013) ("because [defendant] has no presence in the United States, it may be difficult or impossible for [plaintiff] to enforce a monetary judgement against [defendant]"); *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) (granting preliminary injunction; "the prospect of collecting money damages from a foreign defendant with few to no assets in the United States tips in favor of a finding of irreparable harm"); *Nike, Inc. v. Fujian Bestwinn Industry Co., Ltd.*, 166 F. Supp. 3d 1177, 1179 (D. Nev. 2016) ("[B]ecause [defendant] has no presence in the United States, it may be difficult or impossible for [plaintiff] to recover a money judgement against [defendant]"). For the reasons stated above, Plaintiff does not have an adequate remedy at law and will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

### iii. **The Balancing of Equities Weighs in Plaintiff's Favor.**

"Following the law is not a hardship." *Tempur Sealy Int'l*, 2024 WL 2288890, at *3. As Plaintiff has shown, Defendants have violated the law, harming Plaintiff's reputation and goodwill in the process. Any hardships from injunctive relief that Defendants would face in this case are self-inflicted and would stem from abiding by the law, and such hardships would be greatly outweighed by the hardships faced by Plaintiff, including damage to her goodwill. *Id*. Defendants

took a calculated risk when they sought to capitalize on Plaintiff's Personality, and Defendants' supposed "harm" should be given minimal deference. *Id*. The balance of equities clearly leans in Plaintiff's favor.

### iv. The Public Interest is Served by Entry of the Injunction.

The prevention of consumer confusion through enforcement of trademark laws has been deemed to serve the public interest. *Tempur Sealy Int'l*, 2024 WL 2288890, at *3 (citing *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000)). As discussed above, the same consumer protection concerns that underlie trademark laws also serve as the foundation of false endorsement claims under the Lanham Act. Similarly, the control given to individuals over their right of publicity can help protect the public by avoiding the use of Personality to promote products that are of dubious quality. *Cf. Jackson v. Roberts (In re Jackson)*, 972 F.3d 25, 37 (2d Cir. 2020) ("Some right of publicity claims, for example, target false endorsements, and as such vindicate a state's interest in preventing consumer confusion.") (cleaned up). This is especially important in this case, considering that Defendants' Products are intended to be ingested or topically applied by consumers and can thereby impact consumers' physical health. Given that Plaintiff has become a trusted authority in the sexual health space, an injunction will serve to benefit the public by eliminating any unwarranted goodwill gained by Defendants through a perception of endorsement of Defendants' Products by Plaintiff.

### b. Plaintiff is entitled to equitable relief.

The Lanham Act authorizes this Court to issue injunctive relief, including specifically for claims under 15 U.S.C. § 1125(a), such as Plaintiff's false endorsement claim. 15 U.S.C. § 1116(a). Similarly, under the Indiana right of publicity statute, courts "may order temporary or permanent injunctive relief," except against "a news reporting or an entertainment medium" that

has met certain requirements. IND. CODE § 32-36-1-12(2); *see also* IND. CODE § 32-36-1-13 (addressing limited carve-out for injunctive relief against news reporting or entertainment media). Defendant does not qualify as a "news reporting or an entertainment medium." *See* IND. CODE § 32-36-1-4. For the reasons set forth below, the Court should grant injunctive relief in favor of Plaintiff.

### i. A Temporary Restraining Order Immediately Enjoining Defendants' Unauthorized and Unlawful Use of the Plaintiff's Personality is Appropriate.

Plaintiff requests an injunction requiring the Defendants to immediately cease offering for sale any of the Defendants' Products in a manner that creates a perception that Plaintiff endorsed Defendants' Products or that otherwise uses Plaintiff's Personality without authorization. Such relief is necessary to stop the ongoing harm to Plaintiff's rights in the promotional use of her Personality, Plaintiff's brand, associated goodwill, as well as harm to consumers, and to prevent the Defendants from continuing to benefit and unjustly enrich themselves from unauthorized use of Plaintiff's Personality. The need for *ex parte* relief is necessitated by today's global economic conditions where infringers can operate anonymously over the internet and often escape the jurisdictional reach of the authorities. Plaintiff is presently unaware of both the true identities and locations of the Defendants, as well as other ecommerce stores used to distribute Defendants' Products. Courts have often authorized immediate injunctive relief in similar cases involving the sale of infringing products. *See*, *generally*, *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897 (N.D. Ill. 2015).

### ii. Preventing the Wrongful Transfer of Assets is Appropriate.

Plaintiff requests an *ex parte* restraint of Defendants' assets so that Plaintiff's right to an equitable accounting of Defendants' profits from Defendants' sales of products as a result of the

Infringing Ads (and any other unauthorized uses of Plaintiff's Personality) is not frustrated. Issuing an *ex parte* restraint will ensure Defendants' compliance. If such a restraint is not granted in this case, Defendants may ignore their instructions from the Court and merely transfer financial assets overseas to accounts out of reach of this jurisdiction. *See Chrome Cherry Ltd.*, 2021 WL 6752296, at *2. Specifically, upon information and belief, the Defendants in this case hold most of their assets in offshore accounts, making it simple to dispose or remove assets, which will render an accounting by Plaintiff to be ineffective and meaningless. *See id*.

Courts have the authority to issue prejudgment asset restraints when a plaintiff's complaint seeks relief in equity. *See LeSea, Inc. v. Lesea Broad. Corp.*, 3:18CV914-PPS/MGG, 2022 WL 621039, at *2 (N.D. Ind. Mar. 3, 2022) ("Although generally a court may not freeze a defendant's assets merely to preserve them for a plaintiff's potential recovery, a restraint on assets is available when a plaintiff seeks equitable relief."); *Black & Decker Corp. v. Positec USA Inc.*, 118 F. Supp. 3d 1056, 1066 (N.D. Ill. 2015) (citing *Reebok Int'l v. Marnatech Enters.*, 970 F.2d 552, 559 (9th Cir. 1992)). Plaintiff has demonstrated a strong likelihood of success on the merits of Plaintiff's false endorsement claim under 15 U.S.C. § 1125(a), and Plaintiff is entitled to recover the extent of Defendants' total profits. 15 U.S.C. § 1117(a). Plaintiff seeks, among other relief, that Defendants account for and pay to Plaintiff all profits realized by Defendants due to their unlawful acts. *See id*.; IND. CODE § 32-36-1-11. The Court should therefore grant Plaintiff's request for a prejudgment asset freeze to preserve the effectiveness of the equitable relief sought.

District courts within the Seventh Circuit have entered asset restraining orders for violations of the Lanham Act. *See, e.g.*, *Monster Energy*, 136 F. Supp. 3d at 910. Such decisions recognize that it is proper to restrain said assets when the plaintiff seeks equitable relief. *Lorillard Tobacco Co. v. Montrose Wholesale Candies*, 2005 WL 3115892, at *13 (N.D. Ill. Nov. 8, 2005)

(citing *Grupo Mexicano, de Desarrollo, S.A. v. Alliance Bond Fund*, 527 U.S. 308, 325 (1999) (finding that an asset freeze was warranted when the plaintiff sought a disgorgement of profits, an equitable remedy)); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (deeming asset freeze proper for purposes of stopping cable piracy).

Plaintiff has shown a clear likelihood of success on the merits and an immediate and irreparable harm incurred due to Defendants' infringement. Unless Defendants' assets are frozen, Defendants will hide or move their unlawfully obtained funds to offshore bank accounts. Accordingly, an asset restraint is proper.

### iii. Plaintiff is Entitled to Expedited Discovery

The United States Supreme Court has held that federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380 (1978)). Courts have wide latitude in determining whether to grant a party's request for discovery. *Hay v. Indiana State Bd. of Tax Com'rs*, 312 F.3d 876, 882 (7th Cir. 2002). Furthermore, courts have broad power over discovery and may permit discovery in order to aid in the identification of unknown defendants. *See* FED. R. CIV. P. 26(b)(2). Plaintiff respectfully requests expedited discovery to discover bank and payment system accounts that Defendants use for their sales operations. The expedited discovery requested in Plaintiff's Proposed TRO is limited to include only what is essential to prevent further irreparable harm. Discovery of these financial accounts so that they can be restrained is necessary to ensure that these activities will be contained. *See, e.g., Deckers Outdoor Corp. v. The P'ships, et al.*, No. 13-cv-2167, at *10 (N.D. Ill. Mar. 27, 2013). Plaintiff's seizure and asset restraint may have little meaningful effect without the requested relief. *Id*. Accordingly, Plaintiff respectfully requests that expedited discovery be granted.

### iv. A Bond Should Secure the Injunctive Relief

The posting of security upon issuance of a TRO or preliminary injunction is vested in the Court's sound discretion. *Monster Energy*, 136 F. Supp. 3d at 910 (citing FED. R. CIV. P. 65(c)); *see also Gateway Eastern Ry. Co v. Term. R.R. St. Louis*, 35 F.3d 1134, 1142 (7th Cir. 1994) ("We note that it is within the district court's discretion to increase or decrease the amount as necessary to comport with its findings, or to account for changed circumstances."). Because of the strong and unequivocal nature of Plaintiff's evidence of false endorsement and misappropriation of Plaintiff's Personality, Plaintiff respectfully requests that this Court require Plaintiff to post a bond of no more than Two Thousand U.S. Dollars ($2,000.00), accounting for the maximum of two defendants implicated in the FAC. (*See* Dkt. 10.) District courts in the Seventh Circuit have often accepted an injunction bond at a rate of $1,000 per defendant in ecommerce infringement cases. *See*, *e.g.*, *Luo v. The P'ships et al.*, 1:24-cv-01977, Dkt. 10 (N.D. Ill. Mar 13, 2024) (requiring bond equivalent to $1,000 per defendant); *HONG KONG LEYUZHEN TECHNOLOGY CO., LTD v. The Individuals et al.*, 1:24-cv-06226, Dkt. 10 (N.D. Ill. July 26, 2024) (same); *Funny Soul LLC v. Individuals et al.*, 1:24-cv-01372, Dkt. 14 (N.D. Ill. Mar 7, 2024) (same). In their discretion, district courts may even require only nominal bond as security. *See, e.g., Bd. of Educ., Dist. No. 200 v. Ill. Bd. of Educ.*, 10 F. Supp. 2d 971, 982 (N.D. Ill. 1998) (requiring a nominal bond of $10).

### IV. **CONCLUSION**

Plaintiff's business continues to be irreparably harmed by Defendants' business enterprise based on infringement of the Plaintiff's Personality. Without entry of the requested relief, Defendants' infringement of the Plaintiff's Personality in connection with the making, using, offering to sell, selling, or importing of Defendants' Products will continue to irreparably harm Plaintiff and consumers. Therefore, entry of an *ex parte* order is necessary. In view of the

foregoing, Plaintiff respectfully requests that this Court enter a Temporary Restraining Order in the form submitted herewith.

Dated: November 8, 2024

                                              Respectfully submitted,

                                              /s/ Ilya G. Zlatkin
                                              Ilya G. Zlatkin
                                              Zlatkin Cann Entertainment
                                              4245 N. Knox Ave.
                                              Chicago, IL 60641
                                              ilya@zce.law
                                              Ph. (312) 809-8022
                                              Fax (312) 809-6918

                                              *Counsel for Plaintiff*